NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0090n.06

No. 20-5143

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Feb 12, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROBERT YOUNG, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| CAMPBELL COUNTY, KENTUCKY et al., | ) | |
| | ) | **OPINION** |
| **Defendants-Appellees.** | ) | |
| | ) | |

Before: BATCHELDER, MOORE, and ROGERS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Robert Young was formerly incarcerated at the Campbell County Detention Center ("CCDC") in Kentucky. During his detention, he sustained serious injuries from an assault by another inmate named Papa Ka. After his release, he brought this suit under 42 U.S.C. § 1983, alleging that Campbell County, CCDC's Jailer James Daley, in his official and individual capacities, and several of CCDC's deputies and sergeants violated his constitutional right to adequate medical care and protection from serious harm in jail. The district court granted summary judgment in favor of all defendants, and Young challenges that decision on appeal. Because Young did not put forth sufficient evidence to demonstrate a genuine issue of material fact as to whether his injuries resulted from a policy, custom, or act of Campbell County or Jailer Daley, we **AFFIRM** the district court's grant of summary judgment in favor of Jailer Daley, in his official capacity, and Campbell County. Because Young also did not put forth sufficient evidence to demonstrate a genuine issue of material fact as to whether Deputies Matthew

Fassler, Ryan Henning, and William Snider, Sergeants Jacob Lohr, Anna Mischell, and Lamieka Wright, and Jailer Daley acted with deliberate indifference toward any risk of serious harm posed by Ka or any need for medical care evinced by Young, we **AFFIRM** the district court's grant of summary judgment in their favor as well. However, because Young did establish a genuine issue of material fact on his claim against Deputy Jacob Denney, we **REVERSE** the district court's grant of summary judgment in favor of Deputy Denney, and **REMAND** this case to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

We take the facts of this case in the light most favorable to Young, the party opposing the summary judgment motion. The instant case involves several individual Defendants and their encounters with Young and Ka, the inmate who assaulted Young, as well as the policies and customs of the CCDC and their effects on inmate safety.

### A. The Campbell County Detention Center Prisoner Classification Procedures

At the time of Young's detention, Jailer Daley ran the CCDC. He was responsible for developing the facility's prisoner classification system and had final authority over inmate classification and housing assignments. 501 Ky. Admin. Regs. 3:110 (2016); R. 54-10 (Classification and Housing Policy at 6) (Page ID #1072). Jailer Daley promulgated a written classification policy and post orders that guided classification officers' implementation of the policy. R. 54-10 (Classification and Housing Policy); R. 54-11 (Classification Post Order). The policies and guidelines made classification officers responsible for ensuring that "all inmates are correctly classified using the established guidelines of the facility and assigning housing locations based on those findings." R. 54-11 (Classification Post Order at 1) (Page ID #1073). At all

2

relevant times during this case, CCDC had three classification officers: Deputy Theresa Plummer, Deputy Bernard Henke, and Deputy Henry Webber. None of them was ever named a party to this suit.

Upon a person's arrival for booking at CCDC, classification officers were required to examine their background and conduct an interview to complete the classification process. Classification officers verified whether the person previously stayed in CCDC or whether the person had any other state incarcerations, and the officers collected relevant charge history and records of disciplinary action. *Id.* at 2 (Page ID #1074). During the in-person interview, the officers also questioned the person about their disciplinary history during previous incarcerations, their medical history, whether the person had any friends or family at the facility, and whether the person had any issues with an individual or specific population type at the jail. R. 45 (Plummer Dep. at 54–56) (Page ID #576). Based on the information gathered, classification officers assigned the person a classification of minimum, medium, or maximum and noted whether the person had any special needs. R. 54-11 (Classification Post Order at 2) (Page ID #1074).

Classification officers also were responsible for reclassifying inmates "either due to a request made by the inmate or a change in the inmate's charge/behavior status." *Id.* at 4 (Page ID #1076). To monitor changes in an inmate's behavior, the classification officers reviewed all incident reports generated by the officers supervising the inmates. R. 45 (Plummer Dep. at 102–08) (Page ID #588–89). Jail officials could recommend that an inmate be reclassified, usually by submitting a request in an incident report or an email or by speaking directly to the classification officers. *Id.* at 78–79 (Page ID #582). However, classification officers alone had the authority to

determine whether reclassification was necessary, which was generally at their discretion. *Id.* at 79–80 (Page ID #582).

**B.  Ka's Detention and His Assault of Young**

On March 17, 2016, police brought Young to CCDC due to a probation violation, and classification officers assigned him a minimum classification level. R. 38-3 (Young Admission Report at 1) (Page ID #198); R. 38-4 (Young Primary Classification at 2) (Page ID #202). Officers arrested Ka and brought him to CCDC on April 7, 2016, on charges of drug possession and possession of a handgun. R. 54-3 (Ka Release Report & Assessment at 1) (Page ID #1007). Classification officers assigned Ka a minimum classification level. *Id.* at 2 (Page ID #1008). Ka and Young did not share a cell until sometime in early June 2016.

Before Ka shared a cell with Young, CCDC deputies had disciplined Ka on several occasions, mostly due to Ka's failure to follow CCDC's rules or officials' orders. *See, e.g.*, R. 38-10 (Incident Report); R. 38-11 (Incident Report); R. 38-12 (Incident Report); R. 38-13 (Incident Report); R. 38-14 (Incident Report); R. 38-16 (Incident Report). However, a few incidents were more serious and took place over the course of several days. On May 13, 2016, Sergeant Lohr investigated a request from an inmate named May who shared a cell with Ka. May asked the officers to remove him from the cell because "Ka was making comments about his family and threatening to take commissary from him." R. 38-15 (Incident Report at 1) (Page ID #215). Another inmate related a similar accusation. *Id.* at 2 (Page ID #216). However, other inmates told Sergeant Lohr that May was the one causing problems. *Id.* at 1 (Page ID #215). After completing the investigation, Sergeant Lohr moved Ka to another cell but did not levy any restrictions against him "due to [inmate's] lack of proof of the accusations." *Id.* at 2 (Page ID #216); R. 44 (Lohr Dep.

4

at 65–67) (Page ID #548). On May 15, 2016, Sergeant Mischell submitted a report detailing how Ka was found kicking the wall of his cell; after being restrained, Ka twice turned aggressively toward deputies as they led him to the main hall and placed him in a safety chair due to his continued resistance. R. 38-17 (Incident Report at 3) (Page ID #220). Five days later, on May 20, 2016, Sergeant Mischell "responded to an active fight call" involving Ka and another inmate. R. 38-18 (Incident Report at 2) (Page ID #222). When Sergeant Mischell arrived, deputies had handcuffed Ka and the other inmate and deployed pepper spray to stop them from fighting. *Id.* Both inmates received ten days in isolation, and Sergeant Mischell recommended that Ka be "reclassified due to multiple incidents with jail staff and other inmates." *Id.* The classification officers did not reclassify Ka at that time.

Starting in early June 2016, Ka and Young shared cell 220 in back pod 2 ("BP2"). At some point, Ka stole commissary items from Young. R. 40 (Young Dep. at 40) (Page ID #417). Young did not confront Ka about the stolen items, but another inmate took them from Ka and gave them back to Young. *Id.* at 40–41 (Page ID #417). At around 1:00 p.m. on June 15, 2016, Ka and another inmate named Chapman forced Young into the cell's shower to fight Ka over the commissary items. *Id.* at 42–45 (Page ID #418); R. 54-9 (Investigation Emails at 2) (Page ID #1064).[1] Ka punched Young in the eye, and they fell on the floor with Ka falling on and injuring Young's knee. R. 40 (Young Dep. at 51–52) (Page ID #420). Ka continued to beat Young, and

---

[1]The email notes the date of the assault as Wednesday, June 16, 2016. Young also testified that the assault took place on June 16, although his complaint alleges that the assault occurred on June 15. The district court assumed the assault happened on June 15, and Defendants on appeal, without waiving any rights, assume the same. Appellee's Br. at 8 n.1.

at some point, Young lost consciousness. *Id.* at 52–53 (Page ID #420). After the fight, Young limped back to his bunk with a bruised face and black eye. *Id.* at 54, 56 (Page ID #421). For the next three days, Young mostly slept or was unconscious, did not speak with any jail employee, and rarely left his bed, except to use the bathroom. *Id.* at 56–62 (Page ID #421–23). Chapman brought Young his meals. *Id.* at 57–59 (Page ID #421–22). Although Chapman did not physically prevent Young from asking for help, Young felt that Chapman's continuous presence by Young's bed deterred Young from approaching jail staff to ask for help. *Id.* at 59–62 (Page ID #422–23).

Finally, at around 7:00 a.m. on June 18, Deputy Shawn Hartman performed a medical pass and called for Young to receive his medication, but Young did not get out of his bunk. R. 60 (Hartman Dep. at 67) (Page ID #1606). Deputy Hartman then asked Young to come fill out a refusal form and, as Young approached, Deputy Hartman noticed Young's black eye and limp. *Id.* Deputy Hartman notified his supervisor, Sergeant Lohr, and then took Young to booking. *Id.* at 70 (Page ID #1609). While at booking, Young told Sergeant Mischell that he had been in a fight with Ka, and she sent Young to the medical staff for treatment. R. 40 (Young Dep. at 67) (Page ID #424). As the shift supervisor, Sergeant Mischell continued to investigate the incident, disciplined the inmates involved, and informed her superiors about the results of her investigation. R. 54-9 (Investigation Emails at 2–3) (Page ID #1064–65).

CCDC medical staff x-rayed Young's leg and provided him with crutches and aspirin. R. 40 (Young Dep. at 70–71) (Page ID #425). They scheduled Young an appointment at a hospital, and medical staff at the hospital diagnosed Young with and treated him for a fractured knee. R. 38-24 (Imaging Report at 1) (Page ID #231). Young also told CCDC medical staff that he thought he suffered from a concussion. R. 40 (Young Dep. at 68) (Page ID #424). Although a nurse

6

listened to Young's symptoms and agreed that it sounded like Young might have had a concussion, neither CCDC medical staff nor an outside medical provider examined Young for a concussion. *Id.* at 69, 77 (Page ID #424, 426). Young also never talked to any outside medical provider about his concussion. *Id.* at 77 (Page ID #426).

During these same three days, Defendants Denney, Fassler, Henning, Snider, Lohr, Mischell, and Wright had a variety of opportunities to observe and interact with Young based on their respective duties. These duties included performing headcounts of inmates, passing out meals and medicine, and generally observing BP2 to ensure that inmates complied with CCDC rules and that no unusual or significant events had occurred. *See, e.g.*, R. 54-13 (Inmate Supervision Policy at 1) (Page ID #1086); R. 54-15 (Headcount Post Order at 1) (Page ID #1096). During headcounts, inmates stay in their bunks and "[o]ne deputy will call inmate names while the second deputy visually acknowledges and scans the armband of each inmate." R. 54-15 (Headcount Post Order at 2) (Page ID #1097). "Inmates must respond both verbally and physically." *Id.* However, sometimes the scanners did not work, or inmates did not have wristbands. R. 58 (Fassler Dep. at 14) (Page ID #1386). On those occasions, deputies would visually check the wristbands or simply do a physical count. *Id.* at 14, 17 (Page ID #1386, 1389). During observation scans, a deputy conducts a "visual inspection of each cell area" and observes "inmates' behavior and appearance for unusual or questionable situations" like "bruises or cuts on an inmate's face or arms." R. 54-13 (Inmate Supervision Policy at 1) (Page ID #1086). None of the individual Defendants recalled seeing Young with injuries prior to the morning of June 18, 2016.

## C. Procedural History

Young filed a complaint against Defendants Denney, Fassler, Henning, Snider, Lohr, Mischell, Wright, and Daley in their individual capacities and against Defendants Campbell County and Jailer Daley, in his official capacity, alleging, inter alia, § 1983 claims of deliberate indifference due to their failure to protect Young from inmate violence and their failure to provide medical care.[2]  R. 1 (Complaint) (Page ID #1).  Discovery proceeded, and Defendants filed a motion for summary judgment, arguing, inter alia, that Young failed to put forth sufficient evidence to show that they violated his constitutional rights and, even if they did, that Defendants were entitled to qualified immunity.  R. 38 (Defs.' Mot. for Summ. J.) (Page ID #156).  The district court agreed and held that Young had not put forth sufficient facts that would permit a reasonable juror to find a constitutional violation had occurred; the court concluded that all individual Defendants were entitled to qualified immunity and that the municipality also was not liable. *Young v. Campbell County*, No. 2:17-cv-97, 2020 WL 411710, at *5 (E.D. Ky. Jan. 24, 2020). Young timely appealed.  R. 71 (Notice of Appeal) (Page ID #1847).

## II.  ANALYSIS

### A.  Standard of Review

We review district court grants of summary judgment de novo. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 894–95 (6th Cir. 2004).  "In deciding a motion for summary judgment, this

---

[2]Young voluntarily dismissed several other CCDC officers from this suit, *see* R. 31 (Order of Voluntary Dismissal) (Page ID #143), and Young conceded in his response to Defendants' Motion for Summary Judgment that several Defendants should be dismissed from certain claims.  R. 54 (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 44) (Page ID #1004).

court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 591–92 (6th Cir. 2001). To defeat a summary-judgment motion, the non-movant must put forward "evidence on which the jury could reasonably find for the [non-movant]." *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "Circumstantial evidence may be sufficient to carry this burden, but in considering a summary-judgment motion, courts 'may . . . inquire into the plausibility of circumstantial evidence.'" *Bard v. Brown County*, 970 F.3d 738, 748 (6th Cir. 2020) (quoting *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).

We evaluate Young's claims against the CCDC officials in their individual capacity under the framework of qualified immunity. The framework uses a three-part test, "which requires us to determine (1) whether a constitutional right was violated; (2) whether that right was clearly established and one of which a reasonable person would have known; and (3) whether the official's action was objectively unreasonable under the circumstances." *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)). "Whether qualified immunity applies to an official's actions is a question of law that [we] review[] *de novo*." *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001).

## B. Eighth Amendment Deliberate Indifference to a Substantial Risk of Serious Harm

Young alleges a claim under § 1983, arguing that Sergeants Lohr and Mischell and Jailer Daley, in their individual capacities, were each deliberately indifferent to the substantial risk of serious harm posed by housing Ka with nonviolent inmates like Young. To assert a cause of action arising under § 1983, Young must claim that the actions of a state government official deprived him of a constitutional right. The Supreme Court has held that "[a] prison official's 'deliberate

indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To sustain a deliberate-indifference claim based on officials' failure to protect an inmate from a substantial risk of serious harm, a plaintiff must prove both an objective and a subjective element. *Id.* at 834, 837.

To satisfy the objective component, Young must show that "he [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. Defendants do not contest that Young's claim satisfies the objective component. Clearly, Young suffered from serious harm after being housed with Ka. Young's contention that CCDC failed to reclassify Ka and the undisputed evidence that Young was the victim of an attack from Ka suffices to fulfill the objective component of this analysis. *See Thompson v. County of Medina*, 29 F.3d 238, 242 (6th Cir. 1994) (holding that "while a prisoner does not need to demonstrate that he has been the victim of an actual attack to bring a personal safety claim," such evidence will suffice).

Young argues that the district court erred when it ruled that Young failed to put forth sufficient evidence to satisfy the subjective component. A plaintiff satisfies the subjective component by showing that a jury could reasonably infer that "(1) 'the official being sued subjectively perceived facts from which to infer a substantial risk to the prisoner,' (2) the official 'did in fact draw the inference,' and (3) the official 'then disregarded that risk.'" *Richko v. Wayne County*, 819 F.3d 907, 915 (6th Cir. 2016), (quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). A plaintiff may rely on circumstantial evidence to prove a defendant's subjective knowledge. *Farmer*, 511 U.S. at 842. However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Because we

10

determine each official's liability based solely on the official's own knowledge and actions, we consider each defendant separately. *Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011).

### 1. Sergeant Lohr

Young argues that Sergeant Lohr's one encounter with Ka establishes that Sergeant Lohr had substantial knowledge of Ka's threat to other inmates. Specifically, Sergeant Lohr knew that two inmates accused Ka of threatening and harassing them for their commissary. R. 38-15 (Incident Report). Based upon this knowledge, Young asserts that Sergeant Lohr should have recommended Ka be reclassified because of the harm Ka posed due to his "predatory nature." Appellant's Br. at 53. However, this one incident cannot support an inference that Sergeant Lohr perceived that Ka posed a substantial risk to other inmates' safety such that a reclassification to medium security was warranted. Sergeant Lohr was aware that Ka was "problematic" because "[Ka] had a lot of cell movements" and "[h]ad a tough time staying in one place." R. 44 (Lohr Dep. at 66) (Page ID #548). Drawing all reasonable inferences in favor of Young, a jury could find that Sergeant Lohr knew Ka's behavior was "predatory." *Id.* at 72 (Page ID #549). But this sole incident does not rise to level of showing that Sergeant Lohr was aware that Ka posed a substantial risk of physical danger to Young or any other inmate. *See Thompson*, 29 F.3d at 243 (noting that an absence of prior instances of physical violence forecloses a determination that there was a reasonable fear for inmates' personal safety).

Even considering the risk to the specific inmates involved in this incident, Sergeant Lohr took reasonable measures by reporting the incident and moving Ka from that cell. At the time of the incident, Sergeant Lohr did not possess the authority to classify inmates or dictate where to house them. R. 44 (Lohr Dep. at 16–18, 49) (Page ID #535–36, 544). At most, he could make

emergency moves whenever there was "an altercation" or "an ongoing argument that [he] deemed as possibly volatile to one or multiple other inmates." *Id.* at 45 (Page ID #543). Classification officers handled all housing and reclassification issues; Sergeant Lohr could raise concerns to classification and make recommendations, but classification "had the ultimate say." *Id.* at 49, 70 (Page ID #544, 549). Young cannot show that Sergeant Lohr's "actions or omissions within his limited role" displayed a disregard for whatever risk Ka posed to any inmate's safety. *Williams v. McLemore*, 247 F. App'x 1, 11 (6th Cir. 2007). Because Young has not shown a material dispute as to whether Sergeant Lohr acted with deliberate indifference to Young's safety, the district court properly found that Sergeant Lohr was entitled to qualified immunity.

## 2. Sergeant Mischell

Young contends that Sergeant Mischell's actions show deliberate indifference to the known risk that Ka posed other inmates' safety. He claims that (1) her failure to recommend prior to May 20, 2016, that Ka be reclassified after various encounters in which he displayed aggressive behavior; (2) her failure to ensure that Ka was reassessed for reclassification after her May 20 recommendation to the classification officers; and (3) her failure to place Ka on "red dot" status after he was not reclassified is "more than enough evidence to allow a jury to conclude that Mischell ignored or recklessly disregarded a known risk of serious harm to Young." Appellant's Br. at 51.

We cannot conclude that Sergeant Mischell was subjectively aware that Ka posed a substantial risk to inmates' safety before May 20. Prior to May 20, Sergeant Mischell interacted with Ka on three separate occasions. The first two occurred over the course of two days. Ka disrespected officers and did not follow their instructions, which resulted in classification

removing him from dorm housing and placing him in isolation for three days. R. 38-10 (Incident Report); R. 38-11 (Incident Report). About a month later, Sergeant Mischell submitted a report detailing how deputies found Ka kicking the wall of his cell. When the deputies tried to restrain Ka, he twice turned aggressively toward the deputies as they led him to the main hall and placed him in a safety chair due to his continued resistance. R. 38-17 (Incident Report at 3) (Page ID #220). At most, this evidence suggests that Ka consistently engaged in recalcitrant behavior toward jail officials that is not atypical in a detention setting. But it fails to establish that Sergeant Mischell was aware that Ka might randomly attack other inmates.

Arguably, Sergeant Mischell was aware that Ka posed a substantial risk to other inmates' safety after his fight with another inmate on May 20. But Young cannot show that she displayed deliberate indifference to that risk. Like Sergeant Lohr, Sergeant Mischell could only raise concerns to classification officers and recommend that they reclassify an inmate. R. 41 (Mischell Dep. at 53–54, 96) (Page ID #449, 459). The record reflects that after the May 20 fight, Sergeant Mischell recommended in her incident report that Ka be "reclassified due to multiple incidents with jail staff and other inmates." R. 38-18 (Incident Report at 2) (Page ID #222). Sergeant Mischell also submitted reports for every incident in which she was involved with Ka. CCDC trained its classification officers to review every incident report and use them to evaluate whether an inmate should be reclassified. R. 45 (Plummer Dep. at 78–79, 101–08) (Page ID #582, 588–89). Young faults Sergeant Mischell for not following up on her recommendation to reclassify Ka. Appellant's Br. at 51. Although a more diligent officer might have followed up with classification, Sergeant Mischell's adherence to protocol cannot sustain a claim of deliberate indifference. Rather than consciously disregarding the risk that Ka posed to other inmates,

13

Sergeant Mischell took all the appropriate actions offered by her limited role in reclassification. At most, her conduct suggests possible negligence, which is not enough to establish a violation of Young's constitutional rights. *See Farmer*, 511 U.S. at 835 ("Eighth Amendment liability requires 'more than ordinary lack of due care for the prisoner's interests or safety.'") (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

Nor can Young sustain his claim with his argument that Sergeant Mischell should have placed Ka on "red dot" status. Sergeant Mischell testified that "red dot" status means "[t]wo deputies have to be with [an inmate] at all times" with the inmate being "shackled and cuffed when he leaves the cell." R. 41 (Mischell Dep. at 48–49) (Page ID #447–48). Officials place someone on "red dot" status when there is "a fight with severe injuries," or "if [the inmate] go[es] after deputies [or] jail staff." *Id.* at 51 (Page ID #448). Even construing the facts in a light most favorable to Young, none of the incidents in which Sergeant Mischell was involved rose to the level of necessitating "red dot" status. Accordingly, summary judgment in favor of Sergeant Mischell was proper.

### 3. Jailer Daley

Young contends that Jailer Daley failed to "direct anyone to reclassify Ka," despite Daley's alleged awareness of the substantial risk of harm Ka posed to other inmates, "even though he was ultimately responsible." Appellant's Br. at 50. We analyze Young's individual-capacity claim against Jailer Daley under a supervisory-liability theory because Daley delegates classification and reclassification responsibilities to the classification officers and delegates the review of all incident

reports to classification officers and shift supervisors.[3]  R. 47 (Daley Dep. at 26, 30, 34–35) (Page ID #648–50).

Young's claim does not meet the threshold requirements to impose supervisory liability. Under § 1983, for supervisory liability to attach, the allegation of liability must be based upon something more than a "mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).  Instead, Young must demonstrate that Jailer Daley "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982).  "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.*  Consequently, if a plaintiff cannot establish that a subordinate engaged in unconstitutional conduct, any attempt to impose supervisory liability must fail.  *See McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006).  Because Young has failed to establish a genuine issue of material fact for his failure-to-protect claims against Sergeants Lohr and Mischell, they cannot support his claim against Jailer Daley.

Even if Young could point to other jail officials and demonstrate that their conduct violated Young's constitutional rights, Young does not provide any facts showing that Jailer Daley directly

---

[3]The district court noted that though Young appeared to waive his deliberate-indifference claim against Jailer Daley in his individual capacity, *see* R. 54 (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 44) (Page ID #1004), Young's response to Defendants' motion for summary judgment appeared to assert a deliberate-indifference claim under the failure-to-protect theory against Jailer Daley in his individual capacity.  *Young*, 2020 WL 411710, at *8; R. 54 (Pl.'s Resp. to Defs.' Mot. for Summ. J. at 10–11, 40) (Page ID #970–71, 1000).  Thus, the district court considered whether a failure-to-protect claim against Jailer Daley in his individual capacity would survive summary judgment.  In his brief on appeal, Young continues to pursue a failure-to-protect claim against Jailer Daley in his individual capacity, *see* Appellant's Br. at 46–50, and Jailer Daley responds to those arguments in his brief.  Appellee's Br. at 25–27. Thus, we do not consider this claim to be waived.

participated in such conduct. The record reflects that Jailer Daley did not directly participate in any reclassification assessment for Ka. *See* R. 47 (Daley Dep. at 35) (Page ID #650). Young did present some circumstantial evidence that, when viewed in a light most favorable to Young, might allow a jury reasonably to infer that Jailer Daley saw or at least heard about Ka's more serious incident reports. Jailer Daley testified that classification officers and supervisors brought significant reports to his attention, that he tried to review significant reports on his own, and that every Thursday he met with classification officers, supervisors, and other officers to review "particular issues or occurrences." *Id.* at 21–31 (Page ID #647–49). Under his definition, significant issues included "[r]ecurring assaults with a single inmate," a case with a "significant injury," or circumstances where an inmate consistently violates rules. *Id.* at 24–25 (Page ID #647– 48). Arguably, the incident report where Sergeant Mischell recommends that Ka be "reclassified due to multiple incidents with jail staff and other inmates" would qualify. R. 38-18 (Incident Report at 2) (Page ID #222). However, as mentioned earlier, Jailer Daley almost never participated in the reclassification of inmates. R. 47 (Daley Dep. at 35) (Page ID #650). Thus, the mere fact that Jailer Daley might have reviewed an incident report involving a recommendation that Ka be reclassified does not establish that Jailer Daley directly encouraged or participated in any classification officer's alleged failure to assess or reclassify Ka.

Nor has Young presented any evidence that Jailer Daley implicitly authorized, approved, or knowingly acquiesced in the behavior of his subordinates in their alleged violation of Young's rights. When a jail official is alleged to be personally responsible for a specific duty that the officer delegates, we must determine whether the supervisor "abandon[s] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the [jail]." *Taylor*

16

*v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995). For example, in *Taylor*, we determined that the warden was personally responsible for reviewing and approving all prisoner transfers and concluded that the plaintiff had shown a genuine issue as to whether the warden was aware of and acquiesced in his subordinates' improper approval of transfer orders when the warden (1) was aware that his direct designees redelegated authority without any authorization; (2) did not know the procedures they used to approve transfers; and (3) "had no review procedures in place to determine whether his authority was being abused." *Id.* at 80. Young provides no comparable evidence. In contrast, the record reflects that Jailer Daley routinely met with classification officers, knew the training and policies used by the classification officers, and had no knowledge of any serious incidents caused by classification officers failing to reclassify an inmate. R. 47 (Daley Dep. at 21–25, 30–31, 34, 37–44, 82) (Page ID #647–652, 662). Because Young has not met his burden to provide evidence showing that Jailer Daley knew his policies and procedures were not working and yet completely abdicated his responsibilities, Young's supervisory-liability claim fails to survive summary judgment.

## C. Eighth Amendment Deliberate Indifference to a Serious Medical Need

Young also claims that several CCDC officials violated his Eighth Amendment rights by acting with deliberate indifference toward his serious medical needs that resulted from Ka's assault. Appellant's Br. at 34. Specifically, Young claims that the three-day delay in providing him medical treatment for his injuries violated his constitutional right to adequate medical care.[4]

---

[4]Young does not challenge the treatment he received after Deputy Hartman discovered his injuries on the morning of June 18.

*Id.* at 45. Like a failure-to-protect claim under the Eighth Amendment, a claim based on deliberate indifference to a serious medical need has an objective and a subjective component. *Blackmore*, 390 F.3d at 895. "The objective component requires the existence of a 'sufficiently serious' medical need." *Id.* (quoting *Farmer*, 511 U.S. at 834). As with a failure-to-protect claim, to prove the subjective component, a plaintiff must establish that an official "knows of and disregards an excessive risk to inmate health or safety," which requires the official to "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Farmer*, 511 U.S. at 837). Consequently, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Nonetheless, a plaintiff may provide circumstantial evidence from which we can infer that a prison official had the requisite knowledge. *Id.* at 842. We assess the subjective component "in light of the prison authorities' current attitudes and conduct." *Blackmore*, 390 F.3d at 895 (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). As discussed earlier, we consider each defendant's liability based solely on the official's own knowledge and actions. *See Bishop*, 636 F.3d at 767.

Young contends the district court erred in finding that not all his injuries constituted objectively serious medical needs. Appellant's Br. at 34–35. Specifically, Young argues that his alleged black eye and concussion should serve as a basis for his claim along with his knee fracture. To establish a sufficiently serious medical need, a plaintiff must point to a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d

18

510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). But when a plaintiff's "affliction is seemingly minor or non-obvious," the plaintiff must provide medical proof so that we are able to "assess whether the delay [in adequate medical care] caused a serious medical injury." *Blackmore*, 390 F.3d at 898. Young's knee fracture clearly qualifies as a serious medical need. However, no doctor ever diagnosed Young's black eye as mandating treatment, nor is there any medical evidence in the record that Young suffered a concussion or any evidence that it was obvious that he suffered from a concussion. Thus, the issue on appeal is whether the facts show that Young's black eye evinced "an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Id.* The district court found that Young's black eye was a minor or non-obvious injury. We disagree. On June 18, 2016, three days after the assault, the medical staff noted that Young had a black eye. R. 38-21 (Medical Progress Notes) (Page ID #225). Young also testified that Ka punched him in the face repeatedly and that his face was bruised and swollen with a black eye that lasted two weeks. R. 40 (Young Dep. at 52–54) (Page ID #420–21). On June 19, when Sergeant Mischell viewed the video recording of cell 220 on the day of the assault, she noticed that Young came out of the shower "limping and his face was red and bloody." R. 54-9 (Investigation Emails at 2) (Page ID #1064). Viewing these facts in a light most favorable to Young, we conclude that a layperson would clearly know that a bruised, bloodied, swollen face with a black eye required prompt medical attention. *See, e.g., Bush v. Dickerson*, No. 16-6140, 2017 WL 3122012, at *3 (6th Cir. May 3, 2017) (order) (holding that a plaintiff's swollen eye and several cuts to his face due to an assault constituted injuries that "a layman would clearly know required prompt medical

attention"). Accordingly, we must consider Young's arguments concerning Defendants' awareness and treatment of his knee injury and his black eye.

### 1. Deputy Denney

Of all Defendants, Deputy Denney had the most opportunities to observe Young after the assault occurred at approximately 12:40 p.m. on June 15. Deputy Denney worked day shifts on June 15 and June 16 and covered BP2 (Young and Ka's cell area) from about 1:00 p.m. to 7:00 p.m. for each shift. R. 54-17 (Deputy Logs at 31–32, 82–83) (Page ID #1129–30, 1180–81). During those two shifts, he performed a total of seven observation scans, two meal passes, two med passes, and one headcount for the cells in BP2. *Id.* When asked, Deputy Denney did not recall anything about Young or the incident with Ka. R. 56 (Denney Dep. at 40–41) (Page ID #1287–88). But Young contends that Deputy Denney had subjective knowledge of Young's need for medical treatment because Denney's typical conduct during these activities supports an inference that Deputy Denney saw Young limping and his black eye. Young also contends that Deputy Denney consciously disregarded Young's needs by failing to report his injuries or convey him to the medical unit.

There were at least three situations when Deputy Denney might have become aware of Young's injuries: (1) during the two meal passes he conducted; (2) during the seven observation scans; (3) or during the one headcount he performed. We cannot conclude that Deputy Denny was subjectively aware of Young's serious medical need during the two meal passes or seven observation scans. Deputy Denney conducted his observation scan for cell 220 by looking through the cell window, which did not place him close enough to see Young's black eye. *Id.* at 33 (Page ID #1280). Although Deputy Denney testified that he would always require an inmate to come to

the door and get their meal unless they refused, Young's own testimony forecloses any inference that Deputy Denney observed Young limping to receive his meals. Young testified that he remained in bed, mostly asleep or unconscious, the entire three days after his assault due to his injuries, until he approached Deputy Hartman on June 18. R. 40 (Young Dep. at 56–57) (Page ID #421). Young also testified that he did not speak to any jail employee, that he felt personally deterred by Chapman from getting up to go to the cell door, and that Chapman brought him his meals. *Id.* at 56–62 (Page ID #421–423). Based on this testimony, Young fails to establish any genuine dispute as to whether Deputy Denney perceived Young's black eye or limp during meal passes or observation scans.

Deputy Denney did testify, however, that for headcounts he had inmates sit on their bunks while he checked their wristbands, called their names, and waited to receive some sort of verbal confirmation from the inmate. R. 56 (Denney Dep. at 18–19) (Page ID #1265–66). He conducted a headcount of cell 220 on June 16 at around 1:50 p.m., approximately twenty-four hours after the assault. Based on Deputy Denney's testimony about the way he conducted headcounts, coupled with the fact that every official to come within close range of Young noticed his black eye, a reasonable jury could conclude that Deputy Denney did in fact have knowledge of Young's serious medical need. *See Johnson v. Karnes*, 398 F.3d 868, 875–76 (6th Cir. 2005) (holding that a defendant's testimony about his usual practices established a genuine issue as to whether he had actual knowledge of a plaintiff's serious medical need). CCDC's supervision policy bolsters this inference as it instructs officials to "observe inmates' behavior and appearance for unusual or questionable situations and events" like "bruises or cuts on an inmate's face." R. 54-13 (Inmate Supervision Policy at 1) (Page ID #1086). A jury could reasonably conclude that Deputy Denney

21

noticed a questionable situation and yet failed to question Young to ascertain how he became injured and whether he had any other injuries. *See also Farmer*, 511 U.S. at 843 n.8 (holding that a prison official may not "escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"). Moreover, the fact that no one reported Young's injuries or provided him treatment until June 18 is sufficient to establish a genuine issue of material fact as to whether Deputy Denney disregarded Young's obvious need for medical attention.

Because the district court erred in finding that Deputy Denney did not act with deliberate indifference to Young's serious medical need, we must decide if Young's right to medical care under these circumstances was clearly established and whether Deputy Denney's actions were objectively unreasonable. *Harris*, 513 F.3d at 511. We have consistently held that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes [a constitutional] deprivation." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552 (6th Cir. 2009) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)). As applied to this case, Young's right to adequate medical care for his serious medical needs has been clearly established. Furthermore, the CCDC's own policy shows that Deputy Denney's actions were objectively unreasonable. Consequently, the district court erred in granting Deputy Denney qualified immunity at the summary judgment stage.

### 2. Deputy Fassler

On June 17, Deputy Fassler conducted one meal pass and one headcount for cell 220. According to his testimony, he supervised the training of Deputy Morris who filled out the deputy log for that shift. R. 54-17 (Deputy Logs at 102–03) (Page ID #1200–01); R. 58 (Fassler Dep. at

22

72–73) (Page ID #1444–45). Unlike Deputy Denney, Deputy Fassler testified that for the headcount, he would have stood at the cell door, called Young's name and waited to get a verbal and physical response from Young, even if Young just called out and waved from his bed. R. 58 (Fassler Dep. at 75–76) (Page ID #1447–48). Based on Young's testimony that he stayed in bed, did not speak to any jail official, and received his meals from Chapman, nothing in the record supports an inference that Deputy Fassler perceived a substantial risk to Young's health and then ignored that risk. Most assuredly, Deputy Fassler could have and should have perceived Young's injuries if he had followed CCDC protocol for conducting the one headcount or followed up as to why Young did not take his meal. But there is no liability under a deliberate-indifference standard for what is arguably only negligent conduct. Therefore, we affirm the district court's grant of qualified immunity to Deputy Fassler.

### 3. Deputy Henning

The record reflects that Deputy Henning had no close encounters with Young during the relevant period. Deputy Henning covered BP2 on July 17 from 2:30 p.m. to 7:00 p.m. and performed five observation scans and a meal pass. R. 54-17 (Deputy Logs at 100–01) (Page ID #1198–99). Deputy Henning performed his observation scans for cell 220 by looking through the window. R. 57 (Henning Dep. at 33) (Page ID #1329). He also testified that he did not notice any issues with Young during his shift or see an inmate with a black eye or a limp. *Id.* at 32–33 (Page ID #1328–29). Considering that every official who noticed Young's black eye did so at close range, nothing in the record supports an inference that Deputy Henning perceived any injury to Young and subsequently disregarded the risk such an injury posed. Thus, the district court properly granted summary judgment in favor of Deputy Henning.

### 4. Deputy Snider

Deputy Snider did not cover BP2 during any of the relevant period, although he did work a shift covering BP1 on June 17. R. 38-27 (Daily Logs at 10) (Page ID #247). Young asserts that Deputy Snider would have covered BP2 during Deputy Fassler's lunch break and thus potentially performed one observation scan of cell 220. R. 58 (Fassler Dep. at 80) (Page ID #1452). Deputy Snider testified that his practice for observation scans was to "walk by and get a visual of each cell" and occasionally he would enter the cell to do a check. R. 59 (Snider Dep. at 24) (Page ID #1501). Without any evidence in the record that Deputy Snider actually performed an observation scan of cell 220, Young cannot show a genuine dispute of material fact as to whether Deputy Snider perceived Young's injuries and consciously disregarded them. Thus, Young's claim against Deputy Snider cannot survive summary judgment.

### 5. Sergeant Lohr

Sergeant Lohr was the night-shift supervisor on June 17 through June 18 from 7:00 p.m. to 7:00 a.m. R. 38-27 (Daily Logs at 11) (Page ID #248). He conducted three supervisory passes of BP2. *Id.* Sergeant Lohr testified that for cell 220, he would simply look through the cell window to make sure that there were no issues. R. 44 (Lohr Dep. at 99, 102) (Page ID #556–57). Because Sergeant Lohr never viewed Young at a close range, Young cannot establish an inference that Sergeant Lohr perceived his injuries but failed to take reasonable measures to alleviate the risk to Young's health. The district court properly granted summary judgment in favor of Sergeant Lohr.

### 6. Sergeant Mischell

Sergeant Mischell was the day-shift supervisor on June 17 and June 18 and worked both days from 7:00 a.m. to 7:00 p.m. R. 38-27 (Daily Logs at 9, 14) (Page ID #246, 251). On June

24

17, she conducted three supervisory passes of BP2. *Id.* Sergeant Mischell testified that for her supervisory passes she would simply check to make sure "everybody was doing what they were supposed to be doing and the area was safe and secure." R. 41 (Mischell Dep. at 19) (Page ID #440). As with Sergeant Lohr, the evidence does not substantiate that Sergeant Mischell was in close enough range to perceive Young's injuries during her supervisory passes. Thus, the evidence does not support a deliberate-indifference claim against her.

### 7. Sergeant Wright

Sergeant Wright was the night-shift supervisor on June 15 to 16 and June 16 to 17 from 7:00 p.m. to 7:00 a.m. R. 38-27 (Daily Logs at 3, 7) (Page ID #240, 244). She conducted three supervisory passes of BP2 on her first shift and two on her second shift. *Id.* During her rounds, Sergeant Wright usually looked through cell 220's window but would occasionally enter the cell if something did not look right. R. 46 (Wright Dep. at 23–24) (Page ID #626). If she entered the cell, she tended to check faces and liked to make sure she got a verbal response from every inmate. *Id.* However, once lights went out at 11:00 p.m. until the lights turned on at 6:00 a.m., Sergeant Wright generally left the inmates undisturbed and would simply look through the cell window. *Id.* at 52–56 (Page ID #633–34). All but one of Sergeant Wright's supervisory passes during June 15 through 17 took place during lights out. R. 38-27 (Daily Logs at 3, 7) (Page ID #240, 244). Based on Sergeant Wright's testimony concerning her practices, there is no merit in Young's argument that Sergeant Wright likely was aware of Young's injuries but consciously acted with deliberate indifference to his health. Thus, the district court properly granted Sergeant Wright qualified immunity.

## D. Municipal Liability

Young contends that the district court erred in finding that Campbell County and Jailer Daley, in his official capacity, were not deliberately indifferent toward the risk of harm posed by Defendants' actions and policies. A suit against Jailer Daley in his officially capacity is permissible under § 1983 and is equivalent to a suit against the entity on whose behalf he acts—Campbell County. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

To prevail in a § 1983 suit against a municipality, it is not enough for a plaintiff simply to demonstrate that a municipality's employee engaged in unconstitutional conduct. Instead, "a plaintiff must show that the alleged violation occurred because of a municipal policy, practice, or custom." *Brown v. Chapman*, 814 F.3d 447, 462 (6th Cir. 2016). This requires the plaintiff to prove that the municipality's deliberate conduct "was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). A plaintiff can show the existence of a municipal policy, practice, or custom by identifying: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). In most cases, if a plaintiff cannot establish that individual defendants violated the plaintiff's constitutional rights, municipal liability will not attach. *See, e.g.*, *McQueen*, 433 F.3d at 471. However, we have also recognized other instances in which a lack of individual liability will not foreclose a municipal-liability claim. *See, e.g.*, *Epps v. Lauderdale County*, 45 F. App'x 332, 334–35 (per curiam) (Cole, J., concurring) (noting that municipal liability may attach when individual defendants are exonerated but "municipal liability is based on the actions of

26

individual government actors other than those who are named as parties" or when "the combined acts or omissions of several employees acting under a governmental policy or custom [violates] an individual's constitutional rights") (citation omitted). Young argues that (1) Campbell County's express classification policies show a deliberate indifference to the risk of nonviolent inmates being placed with a violent inmate; (2) Jailer Daley's actions as a final decision-maker exhibited a deliberate indifference to safety risks faced by Young; and (3) Jailer Daley had a custom of tolerating his employees' unconstitutional acts by "failing to investigate and punish meaningfully allegations of unconstitutional conduct." Appellant's Br. at 14–33. All of Young's arguments are unavailing.

Young has not presented any facts from which a jury could reasonably find that Campbell County had a policy or custom that caused a violation of Young's constitutional right to protection from inmate violence. An express policy can be unconstitutional in two ways: "(1) facially unconstitutional as written or articulated, or (2) facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). "Where the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with "deliberate indifference" as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice.'" *Id.* (quoting *Brown*, 520 U.S. at 407). To the extent that Young is arguing that Campbell County's classification policies are facially unconstitutional, he provides no authority to substantiate this contention. Young also has not pointed to any evidence showing that the classification policies have been "consistently implemented to result in constitutional violations with explicit or implicit ratification by city

policymakers," except for Young's alleged assault. *Gregory*, 444 F.3d at 752. As the district court found, though Young's expert testified to several inadequacies in the classification policies and how they posed a risk to inmates' safety, *see* R. 38-32 (McCann Expert Report), such testimony does not show that Campbell County acted with deliberate indifference to the known or obvious consequences of its policies. There is no evidence in the record of the expert even finding that similar deficiencies at other jails or prisons have caused constitutional violations. At most, this supports a conclusion that Campbell County acted negligently by adopting or permitting a policy that proved inadequate in this case. *See Perez v. Oakland County*, 466 F.3d 416, 431 (6th Cir. 2006). But negligence cannot satisfy the deliberate-indifference standard.

In some cases, a single act by a policymaker with final policymaking authority may sustain a municipal-liability claim. *Burgess v. Fischer*, 735 F.3d 462, 479 (6th Cir. 2013). However, to prove municipal liability under a single-act theory, Young must demonstrate that Jailer Daley made "a deliberate choice to follow a course of action . . . from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion). As discussed earlier, Young has presented no evidence that Jailer Daley deliberately chose not to reclassify Ka. Consequently, Young has failed to set forth sufficient facts to establish an unconstitutional policy.

Young also has not shown that Jailer Daley and Campbell County had a custom of tolerating unconstitutional acts due to Jailer Daley's failure to investigate or discipline the classification officers or the officers who supervised BP2 from June 15 through 18. In order to establish deliberate indifference due to a final decisionmaker's failure to investigate or discipline, Young must show that "the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which [Jailer Daley] knew or should have known

28

about, (3) yet remained deliberately indifferent about, and (4) that the [CCDC]'s custom was the cause of the [violation]." *Thomas*, 398 F.3d at 433. Young has not met this burden as he has not presented evidence of a pattern of constitutional violations or incidents where inmates were harmed due to failures in the classification system or by CCDC officials failing to follow supervision policies. Absent these showings, "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). Consequently, the facts fall short of showing deliberate indifference by the municipality.

Finally, to the extent that Young argues that CCDC classification officers had an unwritten policy or practice of failing to reclassify violent inmates that was condoned by Jailer Daley, *see* Appellant's Br. at 29–30, such argument is also unavailing. To survive summary judgment under this theory, Young must show, among other requirements, "the existence of a clear and persistent pattern of [illegal activity]." *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996). As discussed earlier, Young has failed to make such a showing. In sum, the district court properly found that Campbell County and Jailer Daley, in his official capacity, could not be held liable with respect to Young's deliberate-indifference claims.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of summary judgment in favor of Deputies Fassler, Henning, and Snider, Sergeants Lohr, Mischell, and Wright, Jailer Daley, and Campbell County; we **REVERSE** its grant of summary judgment in favor of Deputy Denney; and we **REMAND** the case to the district court for further proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Circuit Judge, Concurring.** I join the majority opinion but write separately because I believe that Young's official-capacity claims against Jailer James Daley and the municipal-liability claims involving him fail because Daley lacked final policymaking authority.

"[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). The "identification of policymaking officials is a question of state law," based on where the state places statutory authority to make municipal policy. *Id.* at 124. Kentucky law provides that "[t]he county governing body shall prescribe rules for the government, security, safety, and cleanliness of the jail and the comfort and treatment of prisoners." Ky.Rev.Stat. § 441.045(1).[1] Other provisions charge the county fiscal court with operating prisons in accordance with state statute. Ky.Rev.Stat. §§ 67.080(2)(d), 67.083(3)(e); *see also Johnson v. Hardin County*, 908 F.2d 1280, 1287 (6th Cir. 1990) ("State law contemplates that the authority to promulgate policies for the care of prisoners is not vested in the jailer, but in the fiscal court."); *see also Wimberly v. Leavell*, 110 F.3d 66, 1997 WL 135578, at *1 (6th Cir. 1997) (unpublished table order).

Final policymaking authority "may be delegated by an official who possesses such authority," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), but the plaintiff carries the burden of showing delegation. *See Johnson*, 908 F.2d at 1287 ("[Plaintiff] introduced no evidence

---

[1]Kentucky amended this statute in 2020; the relevant portion was unchanged.

that the fiscal court has explicitly or implicitly delegated its authority to the jailer."). Young did not make such a showing here.

In my view, Daley did not have final policymaking authority under Kentucky law. Therefore, Young's official capacity claims against Daley, and Young's theories of municipal liability that rested on Daley's purported final policymaking authority, fail on this ground alone.